**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

CURTIS LARRICK,                )
                                      )      Civil Action No. 16-cv-282
                Plaintiff,   )
                                        )      United States Magistrate Judge
                 v.                   )      Cynthia Reed Eddy
                                        )
THE SHERIFF OF BEAVER COUNTY   )
PENNSYLVANIA, *et al.*,          )
                                        )
              Defendants.   )

**MEMORANDUM OPINION**[1]

CYNTHIA REED EDDY, United States Magistrate Judge

## I.    INTRODUCTION

Plaintiff Curtis Larrick ("Plaintiff"), a former deputy sheriff for Beaver County, Pennsylvania, filed this civil rights action after being terminated from his position by Sheriff Anthony Guy ("Guy"). In his complaint, Plaintiff alleges that Guy and Beaver County (collectively, "Defendants") violated his First Amendment rights by firing him on the basis of his political affiliation. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1343(a)(3) and (a)(4).

Presently pending before the Court is the Defendants' motions for summary judgment [ECF No. 28]. For the reasons that follow, Defendants' motion will be denied as it relates to the claims against Beaver County and Guy in his individual capacity. Plaintiff's claim against "the

---

[1] All parties have consented to jurisdiction before a United States Magistrate Judge; therefore, the Court has the authority to decide dispositive motions and to eventually enter final judgment. *See* 28 U.S.C. §636, *et seq.*

Sheriff of Beaver County, Pennsylvania" will be dismissed because it is redundant in light of the claim against Beaver County.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The 2015 Election for Beaver County Sheriff

Guy is a Republican who currently serves as the Sheriff of Beaver County.  (DSMF ¶2.)[2] He was elected as Sheriff in November 2015, and began his tenure on January 4, 2016.  (*Id*. ¶64.) As Sheriff, Guy is vested, under provisions of the County Code, with the authority to hire, discharge, maintain, and supervise any and all employees of the Beaver County Sheriff's Office. (*Id*. ¶1.)

Guy was preceded in office by George David ("David"), who served as Beaver County Sheriff from 2007 to 2016.[3]  (DSMF ¶4.)  During the course of David's tenure, the Chief Deputy Sheriff was Jay Alstadt ("Alstadt").  As Chief Deputy, Alstadt was second in command and had responsibility for handling the day-to-day affairs of the office.  (*Id*. ¶5.)

During the course of his tenure, David became embroiled in a scandal that resulted in a criminal indictment and prosecution.  (PSMF ¶20.)[4]  The criminal proceedings obtained a great deal of press coverage, which created a stigma in the Sheriff's Department.  (*Id*.) Guy decided to run for Beaver County Sheriff in 2015 because of what he perceived as "a lot of problems in the [ ] Office . . . , a lack of professionalism, [a] lack of organization," and "turmoil" arising out of

---

[2]    Citations to "DSMF ¶___" refer collectively to Defendants' Concise Statement of Undisputed Material Facts (ECF No. 30), Plaintiff's response thereto (ECF No. 35), and Defendants' Reply to Plaintiff's response (ECF No. 39).

[3]    David also served a prior tenure from 1996 to 1997.  (DSMF ¶4.)

[4]    Citations to "PSMF ¶___" refer collectively to Plaintiff's Concise Statement of Material Facts Precluding Summary Judgment (ECF No. 36) and Defendants' response thereto (ECF No. 41).

Sheriff David's arrest.  (DSMF ¶30.)  Guy ran as a Republican candidate in the primary election and won the Republican nomination.  (*Id.* ¶32.)

Although Sheriff David ran for reelection, he lost the primary election to fellow Democrat Wayne Kress.  (DSMF ¶33.)  Guy then ran against Kress in the general election.  (*Id.* ¶35.)  Guy eventually prevailed, defeating Kress in November 2015.  (*Id.*)

B.  Plaintiff's Political Involvement and Employment History

Plaintiff has a history of active involvement in Democratic politics.  (PSMF ¶¶31-32.)  In addition to having served as a Baden Borough councilman and a Harmony Township Commissioner, Plaintiff served as a committee member of the Beaver County Democratic Party from 1996 to 2012. (*Id.* ¶¶33-34, 36.)  During the 2015 campaign, Plaintiff supported Kress's candidacy for sheriff in both the primary and general elections.  (*Id.* ¶34.)

Plaintiff began working as a deputy sheriff for Beaver County in 1991.  (DSMF ¶3.)  In 2008, he was promoted to the position of sergeant by then-Sheriff David.  (*Id.* ¶6.)

During the time that he worked under David, Plaintiff experienced a number of personal and work-related problems.  Alstadt was often aware of Plaintiff's problems and, in fact, Plaintiff readily confided in Alstadt because he considered Alstadt to be a caring administrator and friend. (DSMF ¶7; Pl.'s Dep. at 66:21-67:8, ECF No. 31-2.)  One such incident involved Plaintiff's discovery that a fellow deputy, Michael Hurst ("Hurst"), had made numerous calls to Plaintiff's wife.  (DSMF ¶14.)  Plaintiff made Alstadt aware of the situation and Alstadt approached Hurst in an attempt to help resolve the matter.  (DSMF ¶¶12-13.)[5]  Another incident involved a fellow deputy, David Hunter, who had complained about Plaintiff conversing with his girlfriend while

---

[5]    Plaintiff was eventually enrolled in an Employee Assistance Program based on rumors that he had made a drunken threat to burn Hurst's house down.  (DSMF ¶14.)  Plaintiff denies that he ever made such a threat.  (*Id.*)

she was working at the courthouse. (DSMF ¶23.) Plaintiff claims that the misunderstanding was cleared up after he explained to Hunter that the conversations concerned a medical issue that Hunter's girlfriend and Plaintiff's wife had in common. (Pl.'s Dep. at 114:1-7, 115:2-4.) Plaintiff states that he discussed the situation with Alstadt, who agreed that it was completely different from the type of conduct Hurst had in engaged in. (*Id.* at 115:21-25.)

Plaintiff later separated from his wife while continuing to care for his son. In late 2010, Plaintiff was called to his son's school after his wife showed up and attempted to take the child out of school without Plaintiff's permission. (DSMF ¶11; Def.'s Ex. D, ECF No. 31-4.) Alstadt was contacted by the school in an effort to notify Plaintiff and wound up attempting to explain to Plaintiff's ex-wife that she could not violate the existing custody arrangement. (DSMF ¶11.)

Plaintiff divorced his wife in 2011, but his problems continued thereafter. (DSMF ¶17.) At a certain point Plaintiff came to believe that Deputy Kristen Chapes ("Chapes") was sharing information about him with his ex-wife and that Sergeant James McGeehan ("McGeehan") was attempting to contact his ex-wife over Facebook. (*Id.* ¶19.) Plaintiff shared his concerns with Alstadt, who approached Chapes and McGeehan about their interactions. (*Id.*) When Plaintiff's ex-wife got remarried, he discovered that someone had placed 20 copies of the wedding announcement in his mailbox at work. (*Id.* ¶20.) Upon learning about this, Alstadt told Plaintiff that he would address the matter and acknowledged that it needed to stop. (*Id.*)

After Plaintiff's ex-wife remarried, her new husband sent Sheriff David a letter detailing numerous incidents of harassment that Plaintiff had allegedly engaged in over the course of several months. (Defs.' Ex. E, ECF No. 31-5.) Plaintiff denies the allegations of harassment and claims that these false allegations stopped only after Plaintiff's lawyer advised the couple to cease and desist in their false accusations. (DSMF ¶15.) Plaintiff's ex-wife also obtained a temporary

protection-from-abuse order against Plaintiff on behalf of their son based on allegations of physical abuse, which required Plaintiff to relinquish his gun and pistol permit. (*Id.* ¶16.) Plaintiff asserts that his ex-wife dropped her claim after it was determined that the allegations of abuse were unsubstantiated and that his son had been coached. (*Id.*)

In 2012, Plaintiff was demoted from sergeant to deputy sheriff based on Sheriff David's perception that the divorce was affecting Plaintiff's work performance. (DSMF ¶¶8, 17, 19.) In or around September of that year, it was discovered that Plaintiff's ex-wife was still listed as a covered individual on his health insurance. (Defs.' Ex. F, ECF No. 31-6.) The incident resulted in an employee of the human resources department requesting Alstadt to inform Plaintiff about the need to complete certain paperwork in order to remove his ex-wife from his insurance plan. (*Id.*)

In July 2014, Plaintiff was on vacation with his son in Ocean City, Maryland, when his ex-wife called the police and reported that Plaintiff was abusing their son. (DSMF ¶25; Defs.' Ex. K, ECF No. 31-11.) Plaintiff contends that the allegations were bogus and that the police investigation revealed no abuse; he does not deny, however, that, per department protocol, he notified Alstadt of the incident. (DSMF ¶25.)

The following month, Alstadt was made aware of an investigation conducted by the human resources department into allegations that Plaintiff had made inappropriate comments to Deputy Kayla Stevenson. (DSMF ¶21; Defs.' Ex. H, ECF No. 31-8.) Rick Darbut ("Darbut"), then the Human Resources Director, spoke to Plaintiff about the incident but closed the file without a finding of any wrongdoing. (DSMF ¶21.) According to Plaintiff, Stevenson later apologized and admitted that she had been "coerced" into making the complaint by Sheriff David. (*Id.*)

In September 2014, Alstadt received word that a judge in the courthouse had been complaining about Plaintiff bothering his female law clerk. (DSMF ¶22.) According to Alstadt's

incident report, the judge indicated that Plaintiff was following his law clerk around and trying to communicate with her, and both the law clerk and the judge wanted it to stop. (Defs.' Ex. I, ECF No. 31-9.) Alstadt spoke to Plaintiff about the incident and, although Plaintiff disagreed with the judge's description of the situation, he agreed to avoid the clerk while on duty. (DSMF ¶22.)

Between July and December 2015, Plaintiff was on FMLA leave for ischemic colitis. Plaintiff also took FMLA leave to address his son's anxiety-related problems. (PSMF ¶15.) At one point, Sheriff David complained to the Human Resources Department about Plaintiff's personal problems interfering with his work. (DSMF ¶28.)

As noted, David became embroiled in a criminal investigation and prosecution while serving as Beaver County Sheriff. (PSMF ¶20.) Following his initial arrest, David was prohibited from being around firearms as a condition of his bond. (Id. ¶22.) At some point thereafter, Plaintiff witnessed David handling a shotgun in the gun locker room of the sheriff's office while in the presence of then-Lieutenant John Frantangeli ("Frantangeli"). (Id. ¶23.) Plaintiff reported the incident to another Lieutenant, Thomas Ochs ("Ochs"), and later testified about the incident on behalf of the Commonwealth. (Id. ¶¶22-23; DSMF ¶31.) As a result of these events, Alstadt advised Plaintiff that he should stay away from David pending resolution of the criminal proceedings. (Pl.'s Dep. at 133:1-13.)

Thereafter, Plaintiff came to believe that certain employees within the Sheriff's Department -- including Frantangeli, Hurst, and Randy Tallon ("Tallon") -- were lobbying to get him fired. (PSMF ¶70.) At some point shortly after the 2015 primary election, Plaintiff overheard Tallon say that he considered Plaintiff to be a "rat" who could not be trusted because of the fact that Plaintiff had testified against David. (Id. ¶¶63-64.)

At a subsequent point during the summer of 2015, Plaintiff overheard Tallon say that Plaintiff would be fired if Guy were elected because of Plaintiff's support of Kress. (PSMF ¶¶60-62.) Plaintiff understood this comment to mean that, if Guy was elected, Tallon would be in a position to make suggestions that would affect Plaintiff negatively. (*Id.*¶68.) Plaintiff told Alstadt about Tallon's comments, and Alstadt indicated he would look into the matter. (*Id.* ¶¶65-66.) Plaintiff later learned that Alstadt had met with HR Director Rick Darbut but that nothing could be done because Sheriff David would not take any action against Tallon. (*Id.* ¶67.)

At some later point while Plaintiff was home on medical leave, he had another encounter with Tallon. (PSMF ¶71.) According to Plaintiff, Tallon drove by in his vehicle, rolled down the window, and stated, "Hey asshole, your time is coming." (*Id.* ¶72.) Plaintiff claims that he reported the incident to Alstadt but was told to keep quiet because Sheriff David would not do anything about the situation. (*Id.* ¶¶73-74.) Based on these incidents, Plaintiff perceived that he would be fired if Guy won the election. (*Id.*¶75.)

C. Plaintiff's Election Day Encounter with Guy

On the day of the general election, Plaintiff was working at a polling station when he was approached by an elderly man who mistook Plaintiff for Guy and began yelling at Plaintiff. (PSMF ¶¶77, 81, 82, 83.) Plaintiff was surprised that the elderly man had mistaken him for Guy, because Plaintiff did not resemble Guy and he also was wearing a tee-shirt that said "Wayne Kress for Sheriff." (*Id.* ¶¶85-87.)

As he was leaving the scene, Plaintiff encountered Guy. (PSMF ¶88.) Plaintiff introduced himself and shared the story about the man who had just mistaken him for Guy. (DSMF ¶37.) The details of this exchange are disputed.

Guy claims that, after hearing Plaintiff's story and learning his identity, he (Guy) confronted Plaintiff about certain misinformation that Plaintiff had reportedly been spreading about Guy's intended staffing decisions within the office. Guy testified about the incident as follows:

> ... I said I'm glad I'm finally getting a chance to meet you because I had been hearing your name recently and hearing that you had been saying some things about me that are not true.
>
> ***
>
> ...I told him that people were telling me that he had been telling people that I was going to bring George David back to work in the Sheriff's Office, that I was going to bring Joe David back to work in the Sheriff's Office and I was going to keep all the people that should be fired from the Sheriff's Office.
>
> And I told him that I had been in law enforcement for a long time and that before I would repeat things like that, I would make some attempts to verify them if they were true. I said I have a Facebook page, a website, an email address that's easy to find. I said you've been Sheriff's Deputy for sometime [sic], I think if you wanted to contact me, you could probably get my phone number fairly easily. I said I wish you would have asked me those things before you started spreading those lies.
>
> ***
>
> ... He said, well, that's the things that I heard so that's what I'm repeating, that's what I'm telling people.

(Guy Depo. 46:9-47:13.)

Plaintiff recalled the details of this conversation somewhat differently. According to Plaintiff, he first gave Guy the "heads up" about the gentleman who had yelled at him. (Pl.'s Depo. at 140:8-18.) Plaintiff then rhetorically questioned how he could have been mistaken for Guy in light of the fact that he had been wearing a Kress campaign shirt at the time of the encounter. (*Id*. at 140:19-22.) Guy replied, "I see that" in reference to Plaintiff's shirt and, according to Plaintiff, "didn't look too happy I was wearing it . . . ." (*Id*. at 140:22-23.) Plaintiff claims he explained to

Guy that he had always been politically active and was backing the Democratic slate of candidates in the election.  (*Id*. at 140:23-25.)  At that point, according to Plaintiff:

> [Guy] said, so you're Curt, and I said, yeah, and he goes . . . so why are you telling people I'm firing people?  And I was kind of caught off guard by that, and I said, the only thing I said to people is that it got back to me that I was being fired.  And when he asked by who, I told him Randy Tallon, Mike Hurst.
>
> He did indicate, he said, I wish you would have come to me prior to the election, and I told him, I said no disrespect, it wasn't going to change who I supported one way or another.  I told him, I'm friends with Wayne, I said, but I encourage you, please, talk to state police, different people, they will tell you what is really going on with Mike and Randy and it's documented.  There's a history, there are things going on that you need to be made aware of.
>
> And it just seemed like he wasn't happy that, you know, I was supporting who I was, and it was a situation where I felt very uncomfortable because the initial mood was, you know, when I walked up, we were both kind of laughing at first, even with the situation with the elderly gentleman.
>
> But when I told him about Randy, he did explain that he really didn't have any close involvement with those people, but I told him, I said, look, I'm only telling you what they're telling me.  And he reiterated that I wish you would have spoke [sic] to me. And I said . . . it's not going to change, I wish you the best.

(Pl.'s Depo. 141:1-142:8.)

### D.  Guy's Post-Election Transition Process

After winning the general election, Guy conducted an evaluation of every member of the sheriff's office as part of his transition process.  (DSMF ¶4.)  Guy maintains that he did so because he was interested in employing deputies with "strong character, good character, positive character," and "one of the foundational blocks of character is honesty, trustworthiness, reliability."  (*Id.* ¶42; Guy Depo. at 107:25-108:4.)

To that end, Guy utilized a common protocol in evaluating each employee.  Initially, he spoke to two Pennsylvania State Troopers and a prosecutor with the Pennsylvania Attorney General's Office who had been involved in David's criminal case.  (DSMF ¶43.)  Guy also met with Alstadt to discuss personnel and evaluate structural problems in the office.  (*Id.* ¶¶44, 46.) In

addition, throughout December 2015, Guy interviewed each member of the office staff using a common list of questions. (*Id.*¶53.) The interviews involved discussions about problems within the office as a whole that needed to be remedied as well as problems posed by other employees. (*Id.* ¶55.)

Assisting Guy in the transition process was Dean Michael ("Michael"), a former employee of the U.S. Marshal's Service. (DSMF ¶54; PSMF ¶139; Michael Dep. at 12:7-13:8, ECF No. 37-3.) Michael first met Guy at a Republican Party meeting that Michael had attended when he was initially considering running for sheriff himself. (Michael Dep. at 9:11-14.) Subsequently, in the late summer or early fall of 2015, Michael attended a luncheon that Guy's campaign was hosting. (*Id*. at 9:23-10:18.) After Guy won the election, Michael sent him a resume; thereafter, Guy sought Michael's help conducting the employee interviews. (*Id.* at 12:7-13:8.) Michael helped compose the list of interview questions, and he also personally conducted many of the interviews. (DSMF ¶54; Michael Dep.13:5-8.) Guy discussed all of his personnel decisions with Michael and Alstadt. (DSMF ¶67.)

E. Guy's Personnel Decisions and the Ensuing Litigation

On January 4, 2016, after being sworn into office, Guy made substantial personnel changes. He revoked the commission of Alstadt as Chief Deputy and made Michael the new Chief Deputy in his place. (DSMF ¶¶64, 66.) Guy nevertheless decided to retain Alstadt in the lower rank of Captain. He states that he did so because he believed that Alstadt had gained valuable experience in his former position and had successfully held the office together during David's tumultuous administration. (*Id.* ¶45.) Guy also revoked the commission of McGeehan, who by then was serving as a captain, and demoted McGeehan to the position of Lieutenant. (*Id.*¶66.) Ochs and Frantangeli, who had each served as Lieutenants in the David administration, were discharged.

(Pl.'s Ex. 16, ECF No. 37-3.)  In addition to firing Ochs and Frantangeli, Guy fired Sergeant Michael Tibolet, Deputy Stevenson, Deputy Paul Clark ("Clark"), Deputy Tanya Kuhlber ("Kuhler"), and Plaintiff.  (*Id.* ¶65)

Defendants contend that Plaintiff was terminated, in part, because of "character issues," which Guy explained as a lack of "honesty, integrity, trustworthiness, [and] ability to work well as a member of the team," as well as "instances of inappropriate conduct with females," which Guy learned about from the interviews he conducted.  (Defs.' Br. Supp. Mot. Summ. J. at 11, ECF No. 29; Guy Dep. at 131:19-22.)  Another consideration, according to Defendants, was Plaintiff's disruptiveness, in that "he always had something going on" in terms of conflicts that Guy felt should have been handled "at a much lower level."  (Defs.' Br. Supp. at 11; Guy Dep. at 136:18-22.)  In addition, Guy claims he was influenced by his interaction with Plaintiff on election day, in that he believed Plaintiff displayed a willingness to spread unverified information and "exaggerate a situation."  (Defs.' Br. Supp. at 11; Guy Depo. at 132:18-25.)

Plaintiff subsequently commenced this lawsuit on March 10, 2016.  In his complaint (ECF No. 1), Plaintiff asserts a single claim under 42 U.S.C. §1983 for alleged discrimination on the basis of political affiliation in violation of his rights under the First and Fourteenth Amendments. (Compl. ¶23.)

On June 9, 2017, Defendants filed the pending motion for summary judgment.  (ECF No. 28.)  Both sides have filed their respective briefs, concise statements of fact, and evidentiary materials relative to the pending motion, and the issues are now sufficiently joined and ripe for consideration.

## III.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986); *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007); *UPMC Health System v. Metropolitan Live Ins. Co*., 391 F.3d 497, 502 (3d Cir. 2004).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c) and (e); *Williams v. Borough of West Chester, Pa*., 891 F.2d 458, 460-61 (3d Cir. 1989) (the non-movant must present affirmative evidence—more than a scintilla but less than a preponderance—which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e. depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. *Celotex*, 477 U.S. at 322; *see Saldana v. Kmart Corp*., 260 F.3d 228, 232 (3d Cir. 2001). The non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Garcia v. Kimmell*, 381 F. App'x 211, 213 (3d Cir. 2010) (quoting *Podobnik v. U.S. Postal Serv*., 409 F.3d 584, 594 (3d Cir. 2005)).

When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). The Court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). *See also El v. SEPTA*, 479 F.3d 232, 238 (3d Cir. 2007).

## IV. DISCUSSION

Plaintiff's discrimination claim is brought under 42 U.S.C. §1983, which provides that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law. . . .

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 749 n. 9 (1999) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)). To state a claim under section 1983, a plaintiff is required to show that an individual acting under color of state law violated the plaintiff's constitutional rights or statutory rights. *West v. Atkins*, 487 U.S. 42, 48 (1988).

In this case, there is no dispute that Guy acted under color of state law when he terminated Plaintiff's employment. In addition, there is no dispute that Guy acted as an official policymaker for Beaver County when he rendered his employment decision. Consequently, the only question is whether Guy's conduct may have violated Plaintiff's federal constitutional rights. If sufficient evidence exists to establish a constitutional violation, then both Guy (in his personal capacity) and the County may be liable to Plaintiff under §1983. *See Jiminez v. All Am. Rathskeller, Inc.,* 503 F.3d 247, 250 (3d Cir. 2007) (municipal liability may be established where "federal law has been violated by an act of the policymaker itself") (quoting *Natale v. Cambden Cty Corr. Facility,* 318

F.3d 575, 584 (3d Cir. 2003)); *Buoniconti v. City of Phila.*, 148 F. Supp. 3d 425, 443-44 (E.D. Pa. 2015) (discussing liability of municipal policymakers under §1983) (citation omitted).[6]

Here, Plaintiff alleges the violation of his rights to "belief and association" under the First and Fourteenth Amendments.[7]  The United States Supreme Court has clarified that termination of public employees because of their political affiliation violates the First Amendment unless the position at issue involves policymaking.  *See Elrod v. Burns*, 427 U.S. 347, 359 (1976) (explaining that conditioning public employment on support for the political party in power "unquestionably inhibits protected belief and association"); *Branti v. Finkel*, 445 U.S. 507, 513-17 (1980). Defendants have moved for summary judgment on the grounds that Plaintiff cannot establish a violation of his federal constitutional rights.

A.  Prima Facie Case

To establish a prima facie case of politically motivated discrimination, Plaintiff must demonstrate that: (1) he was employed at a public agency in a position that does not require political affiliation; (2) he was engaged in constitutionally protected conduct; and (3) his conduct was a substantial or motivating factor in the government's employment decision.  *Galli v. New*

---

[6]     Plaintiff has also asserted a claim against "the Sheriff of Beaver County, Pennsylvania," which this court construes as a claim against Guy in his official capacity.  This claim is redundant, inasmuch as Plaintiff is already suing the County itself.  Accordingly, the court will dismiss the official capacity claim against the Beaver County Sheriff.  *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690, n. 55 (1978) (stating that official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent"); *see also Brandon v. Holt*, 469 U.S. 464, 471-472 (1985) (As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.).

[7]     Although the First Amendment technically applies only to federal governmental action, First Amendment rights are made applicable to state governmental action through the Fourteenth Amendment's due process clause.  *See Reed v. Town of Gilbert, Ariz.*, —— U.S. ——, 135 S. Ct. 2218, 2226 (2015) (quoting U.S. Const., Amdt. 1).

*Jersey Meadowlands Comm'n,* 490 F.3d 265, 271 (3d Cir. 2007) (citing *Stephens v. Kerrigan*, 122 F.3d 171, 176 (3d Cir. 1997)). If Plaintiff succeeds in establishing these three criteria, then Defendants can avoid a finding of liability by proving that they would have undertaken the same adverse employment action even in the absence of the protected activity. *Id.* at 271 (citing *Stephens*, 122 F.3d at 176).

For purposes of this case, there is no dispute that Plaintiff's position as a deputy sheriff did not require any particular political affiliation. Further, there is no dispute that, in supporting Kress for sheriff, Plaintiff engaged in constitutionally protected activity. Nevertheless, Defendants dispute Plaintiff's ability to show that his protected conduct was a substantial or motivating factor in his termination. And even if it was, Defendants insist that Plaintiff would have been discharged anyway because of non-political, performance-related reasons.

To establish that his political affiliation was a motivating factor in Guy's decision to terminate his employment, Plaintiff must produce evidence of both knowledge on the part of Guy and causation. *Galli,* 490 F.3d at 275. Here, the "knowledge" element is satisfied because there is evidence that Guy was made aware of Plaintiff's political support for Kress when he initially met Plaintiff on the day of the general election.

Still, Defendants contend that no showing of causation can be made on this record. Rather, as discussed, Guy maintains that Plaintiff was terminated because of "character issues" including perceived problems with honesty, integrity, and trustworthiness, an inability to work well as a team member, and instances of inappropriate conduct with females. (DSMF ¶68).

In the context of First Amendment retaliation cases, a plaintiff may prove the requisite causal link between protected activity and adverse action by referring to evidence in the record as a whole. *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000) ("[T]he type of

evidence that can be considered probative of the causal link . . . is not limited to timing and demonstrative proof, such as actual antagonistic conduct or animus. Rather, it can be other evidence gleaned from the record as a whole from which causation can be inferred."); *see also Watson v. Rozum*, 834 F.3d 417, 424 (3d Cir. 2016), *cert. denied sub nom. Coutts v. Watson*, 137 S. Ct. 2295 (2017) ("[C]ausation, like any other fact, can be established from the evidence gleaned from the record as a whole.") (citing *Farrell*, 206 F.3d at 281). In addition, "[i]t is axiomatic that a plaintiff in an employment retaliation case may avoid summary judgment by offering evidence that discredits the reasons articulated by the defense for the adverse employment action." *Montone v. City of Jersey City,* 709 F.3d 181, 191 (3d Cir. 2013) (citing *Stephens v. Kerrigan,* 122 F.3d 171, 181 (3d Cir. 1997)). The plaintiff "need not discredit each proffered reason individually." *Stephens v. Kerrigan*, 122 F.3d 171, 182 (3d Cir. 1997). "If he casts "substantial doubt on a fair number" of the defendant's reasons, he will survive summary judgment." *Id.* (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 n. 7 (3d Cir. 1994)).

Although this case presents a close call, the court finds that there is at least minimally sufficient evidence to sustain Plaintiff's prima facie burden. First, Plaintiff's testimony about his election-day encounter with Guy suggests that Guy expressed disapproval of Plaintiff's show of support for Kress. If credited and viewed in the light most favorable to Plaintiff, this testimony provides at least some evidence of politically driven animus on Guy's part.

Second, Plaintiff has adduced evidence to suggest that Guy's political supporters were treated more favorably than Kress supporters relative to the restructuring that occurred when Guy took office. Of the seven individuals who were terminated, only one – Frantangeli – was a Guy supporter, and the grounds for his termination were quite strong. The record indicates that both of the Pennsylvania state troopers whom Guy consulted recommended that Frantangeli be fired.

(Guy Dep. at 65:1-7.) Guy was informed that, among other things, Frantangelli had falsified an affidavit in connection with an arrest, and the state police had considered charging him with unsworn falsification and obstruction of justice. (Guy Dep. at 69:7-23.) Frantangeli had also been suspended from using the Commonwealth Law Enforcement Assistance Network due to the fact that he was running criminal histories on people without a valid reason to do so. (*Id.* at 70:17-72:1.) Frantangeli had also been involved in the gun locker incident which led to the revocation of David's bond; and he had reportedly borrowed money off numerous people in the office without paying them back. (*Id.* at 72:10-21.)

Guy also terminated three individuals – Ochs, Tibolet, and Stevenson -- whose political affiliations were unknown. (PSMF ¶¶333, 341, 394.) Tanya Kuhlber, a Kress supporter, was also terminated, but Guy denied any knowledge of her political affiliation. (PSMF ¶¶376, 377.) Here again, a jury could infer that there were strong grounds to support the termination of these individuals, because each one had engaged in, or been accused of, some form of criminal conduct. Ochs was terminated after being arrested in relation to David's criminal case. (PSMF ¶340.) Tibolet initially lied to the state police in connection with the David investigation and, in doing so, compromised the prosecutor's ability to present a strong case. (*Id.* ¶345.) Stevenson had been criminally charged with harboring her brother, who was a fugitive. (*Id.* ¶397-98.) Kuhlber had reportedly been involved in a domestic issue in which she tried to run her husband (or boyfriend) over with a car. (*Id.* 383.)

By contrast, the two terminated employees whom Guy knew to be Kress supporters – namely, Plaintiff and Paul Clark – were arguably fired for less significant matters. Plaintiff, as noted, was ostensibly fired because of alleged character issues. For reasons discussed herein, a jury would have reasonable grounds to discount significant parts of Defendants' proffered

explanation but, in any event, there is no allegation that Plaintiff's character defects involved any form of criminal misconduct. Clark was allegedly terminated because Guy considered him to be a bully who did not work hard, who was out for himself, and who was not a team player. (PSMF ¶373; Guy Dep. at 100:8-19.) The record further reflects that Clark, like Plaintiff, was an active Kress supporter. (PSMF ¶¶365-67.) Furthermore, a jury could conclude that Guy was aware of Clark's political activities, because his notes from Frantangeli's interview include the comment, in regards to Clark, "supported Kress wannabe." (*Id*. ¶372.) Viewing this evidence as a whole, a jury could reasonably infer that Kress supporters were held to a stricter standard and treated less favorably than other employees in connection with Guy's restructuring of the sheriff's office.

Defendants contend that no such inference is possible on this record, because Guy demoted Alstadt and McGeehan – both of whom were among his supporters, and he also promoted two Kress supporters (Deputies Bredemeir and Mangerie) from part-time to full-time positions. The record is murky, however, with respect to when Guy learned of Mangerie's political affiliation, and Guy specifically denied knowing that Bredemeir was a Kress supporter when he made his employment decisions. (*See* PSMF ¶¶451-52, 500-01.) As for Guy's demotion of Alstadt and McGeehan, Plaintiff has adduced evidence that Guy was informed by one of the state troopers that Alstadt and McGeehan may have committed acts of dishonesty relative to the grand jury proceedings in David's case. This evidence raises questions of fact about whether Guy afforded preferential treatment to Alstadt and McGeehan, on account of their political support, by keeping them on as part of the command staff in the face of possible wrongdoing. Plaintiff also points out that, by moving Alstadt and McGeehan down one step in the chain of command, Guy was able to make room for another political supporter – *i.e.,* Dean Michael, who took over the position of Chief Deputy. In sum, the evidence concerning Guy's employment decisions gives rise to

competing inferences about whether his decisions were politically motivated. At this stage of the proceedings, however, Plaintiff is entitled to the benefit of every favorable inference that can reasonably be supported by the record.

Apart from the foregoing evidence, Plaintiff has shown that Defendants' explanation for his firing changed somewhat over time. Plaintiff's initial termination notice indicated only that he was being let go as part of a "department restructuring," (PSMF ¶195), without any mention of character issues or misconduct as a basis for his termination. After litigation commenced, Defendants represented (somewhat vaguely) that Guy made his decision based on his determination that "Plaintiff had a reputation for lying and other qualities Sheriff Guy found to be inappropriate." (PSMF ¶197.) At his deposition, Guy's explanation became multifaceted. He initially testified that he was looking for employees with "good character," the "foundational blocks" of which were "honesty, trustworthiness, [and] reliability," and Plaintiff "failed on those counts." (Guy Dep. at 107:24-108:7.) He stated that Plaintiff was "not a team player, . . . created drama," and "was high maintenance." (*Id.* at 108:7-12.) Guy later added that his decision was in "large part" based on "the several instances of [Plaintiff's] inappropriate conduct with females." (*Id.* at 131:20-22.) He went on to add that he had considered his own interactions with Plaintiff on election day -- "[n]ot only the story that he related to me that seemed to fit the model . . . of being someone who would exaggerate," but also his "willingness to tell stories . . . based strictly on what someone else told him and spread that information." (*Id.* at 132:18-25.) To the extent that Guy's explanation changed or expanded over time, a jury may consider whether this demonstrates an inconsistency that is indicative of pretext. *See, e.g., Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 284 (3d Cir. 2001) (endorsing the idea that the "ever-changing nature of the proffered reasons can be considered as detracting from their legitimacy"); *Waddell*

*v. Small Tube Prods., Inc*., 799 F.2d 69, 73 (3d Cir.1986) (noting that district court could "appropriately" have taken employer's inconsistent explanations for termination into account in finding causation necessary to satisfy prima facie case of retaliatory discharge).

In addition, Plaintiff has adduced evidence that is sufficient to cast doubt on some of the specific reasons given for his termination. With regard to the issue of truthfulness, Plaintiff acknowledges that others within the office referred to him as "Lying Larrick," but he points to evidence that suggests Guy knew the moniker was unjustified. Plaintiff notes, for example, that both of the Pennsylvania state troopers whom Guy consulted recommended that Plaintiff be retained, and they specifically informed Guy that Plaintiff had provided truthful information in relation to David's criminal case. (PSMF ¶¶130, 133, 134-35.) Although Alstadt supported Guy's decision to fire Plaintiff, Alstadt testified that he did not personally think Plaintiff was a liar, and he could not recall any instance where Plaintiff had lied about matters pertaining to his job. (Alstadt Dep. at 29:12-18, 30:5-12.) Moreover, Alstadt described Plaintiff's alleged untruthfulness as involving only "minor issues" like exaggerating about people he knew or places he had been – "things that he just was using to be impressive." (*Id.* at 29:20-30:8.) In addition, notwithstanding Guy's representation that "most" of the deputies described Plaintiff as a liar (DSMF ¶57) and that the lack of trust was "nearly universal" (*id.* ¶61), there are only two brief references to his alleged untruthfulness in Guy's extensive interview notes. One reference involves a notation from Ochs' interview that Plaintiff "lies consistently," and another suggests that Frantangeli referred to Plaintiff as "untrustworthy." (ECF No. 31-14 at 5-6.)[8] As discussed, both Ochs and Frantangeli were terminated by Guy based on their own acts of dishonesty. A jury viewing this evidence in

---

[8]	The notes from McGeehan's interview stated only: "LARRICK – NO GOOD." (ECF No. 31-14 at 3.)

the light most favorable to Plaintiff could reasonably infer that Guy's stated concern about Plaintiff's reputation for untruthfulness was exaggerated and implausible.

Plaintiff also points to aspects of Guy's testimony that suggest he had difficulty identifying the things that Plaintiff had actually lied about. When questioned on this issue, Guy recalled Alstadt telling him that "there was a point where Larrick had used the alleged funerals of numerous relatives to the point where they actually had to send a deputy out to a funeral home to see if he was actually there." (DSMF ¶58; Guy Depo. at 85:10-16.) According to Guy's own testimony, however, there was no dishonesty involved in this incident, because Alstadt informed Guy that Plaintiff was actually at the funeral home where he reported he would be. (*Id.* at 85:17-19.) Guy also referenced an incident wherein Plaintiff was in a vehicular accident while on duty and was subsequently reprimanded for not wearing a seatbelt. (DSMF ¶59.) Guy recalled being told by other deputies that Plaintiff had made the comment, "[O]ne time I tell the truth and I get in trouble for it." (Guy Dep. at 120:1-3.) Again, notwithstanding the statement attributed to Plaintiff, it is self-evident from Guy's testimony that Plaintiff reportedly told the truth on this occasion, even though it presumably was against his self-interest to do so. To the extent these incidents informed Guy's determination that Plaintiff was untrustworthy, a jury could discredit Guy's conclusions as incoherent and implausible.

Guy also referenced an incident in which Plaintiff allegedly claimed, falsely, to be in a relationship with a certain Pittsburgh news reporter. (PSMF 278.) Plaintiff denies that he ever told such a lie but, in any event, Guy acknowledged that this alleged incident did not involve any act of dishonesty related to Plaintiff's job. (*Id.* ¶281.)

Even if the allegation about the reporter is credited, though, a jury could reasonably view it as insignificant compared to the acts of dishonesty and/or indiscretion that were committed by

some of Guy's supporters, who were retained. Tallon, for example, had been disciplined by Sheriff David after being caught engaging in sexual conduct with a female in his county vehicle and then lying to Alstadt about it. (PSMF ¶¶ 293, 436-437.) The record here would support the conclusion that Tallon was known by Guy to be one of his political supporters and that, despite Guy's awareness of Tallon's prior misconduct, Guy kept him on staff because Tallon was near retirement. (PSMF ¶¶422-25; Guy Dep. at 51:25-52:3, 140:22-141:15; Alstadt 54:7-12.) Hurst, another Guy supporter, had been involved in a controversy some years earlier when Plaintiff discovered that Hurst, while on duty, had repeatedly been contacting Plaintiff's wife. (PSMF ¶¶453, 455.) When Alstadt confronted Hurst about the situation, Hurst initially lied and denied the contacts. (PSMF ¶¶458, 461.) Hurst later admitted his conduct only after being shown Plaintiff's phone records, which detailed numerous phone calls between himself and Plaintiff's wife. (*Id*. ¶459.) The evidence suggests that Guy was briefed on this incident by Plaintiff, and possibly by Alstadt. (PSMF ¶161; DSMF ¶63; Alstadt Dep. at 54:2-3.) Nevertheless, Hurst was retained while Plaintiff was terminated. As Plaintiff points out, Guy's arguably inconsistent treatment of Hurst and Tallon gives rise to a material dispute about whether Guy actually based his employment decision on Plaintiff's political support for Kress, as opposed to concerns about Plaintiff's truthfulness and good characters.

Defendants' proffered explanation is also contradicted by the evidence relating to Plaintiff's interview. Defendants assert that, during Plaintiff's interview, Michael brought up what others had said about Plaintiff's inability to tell the truth and, although Plaintiff "denied having such an issue," he "could not provide specifics to rebut allegations of being known as a liar." (DSMF ¶62.) Guy, however, was unclear in his deposition about whether specific instances of dishonesty were raised in the interview. Initially, Guy admitted that he could not recall any specific

instances of dishonesty being cited to Plaintiff. (Guy Dep. at 117:6-118:8.) Elsewhere in his deposition, Guy testified that he might have asked Plaintiff about the funerals he claimed to have attended, and he believed that Plaintiff responded by stating that the funerals were all legitimate. (*Id.* at 119:16-19.) If the latter testimony is credited, it demonstrates that Plaintiff did, in fact, rebut a specific allegation of dishonesty with evidence of his own truthfulness. If the former testimony is credited, however, then a reasonable factfinder could conclude that the reason Plaintiff was unable to provide more specific information in his defense was that there was nothing specific for him to rebut. In any event, Plaintiff contends that he explained to Guy and Michael that his testimony against David had engendered bad feelings within the office such that David had persuaded the other employees to view him as no good and untrustworthy. (PSMF ¶¶166, 167, 169.) Plaintiff's version of the facts, if credited, establishes that he did, in fact, offer specific information to rebut the claim that he was viewed as a liar.

Defendants have also cited Plaintiff's disruptiveness within the office and his inability to function as a reliable team member as factors that supported his termination. Plaintiff, however, has adduced evidence suggesting that his work-related conflicts stemmed, in large measure, from the fact that he testified truthfully against former Sheriff David. (PSMF ¶¶27-29, 63, 166-67.) Among those who disapproved of Plaintiff testifying were Hurst and Tallon – both of whom supported Guy in the 2015 election. (*Id.* ¶28; Guy Dep. at 19:5-6, 51:25-52:3.) Plaintiff testified that, on one occasion, Tallon called him a "rat" who could not be trusted because of his testimony. (PSMF ¶63.) On another occasion, Tallon drove past Plaintiff's house and yelled, "Hey asshole your time is coming." (*Id.* ¶72.) Plaintiff states that he told Guy about the retaliation during their election-day encounter and again during his employee interview. (PSMF ¶¶ 67, 69, 95, 98, 160.) Guy also received information from the Pennsylvania state troopers that McGeehan (another of

Guy's political supporters) had been retaliating against Plaintiff. Guy admittedly did not question McGeehan about the alleged retaliation, and there is no indication from the record that he questioned Tallon or Hurst about it either. When these facts are viewed in the light most favorable to Plaintiff, they tend to cast doubt on Defendant's portrayal of Plaintiff as the source of needless conflict and disruption within the Sheriff's office.

Other evidence in the record suggests that a significant amount of the animosity towards Plaintiff was related to his extended absences from work. Alstadt testified that "other people had a lot of animosity toward Curt, because Curt . . . was in a full-time position, had not been at work for a good year pretty much. He was totally unreliable. And they would take offense to almost any time his name was mentioned. So he wouldn't even . . . have known that there was [sic] problems with other employees, but they had a problem with him" and "looked at Curt as a slacker." (Alstadt Dep. at 56:5-13, 57:1-2.) Guy also acknowledged that some of the employees in the office complained during the interview process about Plaintiff being off of work. (Guy Dep. at 92:10-19.) It is undisputed, however, that Plaintiff's leave time was fully authorized under the Family Medical Leave Act. (Alstadt Dep. at 3-11.) Once again, this evidence tends to cast doubt on the Defendants' portrayal of Plaintiff as a poor team player who was unreliable and disruptive because of character issues.

Another factor cited by Defendants to support Plaintiff's termination are the reports that Guy allegedly received about Plaintiff harassing females in the courthouse. (DSMF ¶56.) The record reflects that Guy's only information in this regard came from the second-hand reports of other staff members. (Guy Dep. at 121:11-13.) Guy did not know whether Plaintiff was ever disciplined for his alleged misconduct. (*Id.* at 121:4-7.) Guy did not speak to any of the females involved in these incidents, nor did he bother to raise the issue during Plaintiff's interview. (*Id.* at

121:4-123:3.)  Furthermore, despite Guy's claim that numerous staff members raised this issue, there is no mention anywhere in Guy's extensive interview notes of the harassment allegations. (Defs.' Ex. N, ECF No. 31-14.)  Taken together, these facts support a reasonable inference that Guy was not sincerely concerned about the allegations to the extent Defendants claim.

Finally, the evidence pertaining to the parties' election-day encounter gives rise to competing inferences that bear on the Defendants' proffered explanation for firing Plaintiff.  Guy's account of the incident suggests he was left with the impression that Plaintiff was going to continue spreading false information about an alleged plan to bring Sheriff David back into the office, despite Plaintiff being told otherwise. (Guy Dep. at 46:9-47:13; DSMF ¶ 38.)  According to Guy, this interaction confirmed his view that Plaintiff was someone who was willing to spread untrue information.  (Guy Dep. at 132:18-25; DSMF ¶ 38.)  Plaintiff's account, by contrast, suggests that he merely explained (truthfully) to Guy that Tallon and Hurst had been saying Plaintiff would be fired if Guy won the election.  (Pl.'s Dep. at 141:1-142:8.)  Plaintiff's testimony suggests that this was part of a larger pattern of retaliation which Plaintiff encouraged George to look into by, e.g., talking to Troopers Olayer and Masura.  (*Id.*)  To the extent Plaintiff's version of the encounter is credited, it casts doubt on Defendants' assertion that Plaintiff was fired because he was a knowingly purveyor of false information.

Viewing the record in its entirety, the court finds that there is sufficient evidence to support a finding that Plaintiff's constitutionally protected conduct was a substantial or motivating factor in his termination.

B. Defendants' Affirmative Defense

Defendants nevertheless contend that Guy would have fired Plaintiff irrespective of his political support for Kress because of the character issues previously discussed. As to this assertion, Defendants bear the burden of proof. *See Galli,* 490 F.3d at 271.

In light of the Court's previous discussion relative to Plaintiff's prima facie case, no additional analysis is needed. The same issues of fact that exist relative to causation also preclude the court from finding, as a matter of law, that Guy would have terminated Plaintiff's employment irrespective of any consideration that was given to his constitutionally protected conduct. *See Bertani v. Westmorland Cty., Pennsylvania,* 212 F. Supp. 3d 564, 570 (W.D. Pa. 2014); *Lint v. Cty. of Fayette*, No. Civ. A. 10-321, 2011 WL 2650014, at *8 (W.D. Pa. July 5, 2011).

## V.    CONCLUSION

Based on the foregoing, Defendants' motion for summary judgment will be denied insofar as it relates to Beaver County and Guy in his individual capacity. Plaintiff's official capacity claim against "the Sheriff of Beaver County, Pennsylvania" will be dismissed, as it is redundant in light of the claim against Beaver County.

An appropriate Order follows.

By the Court,

Dated:  March 26, 2018

s/Cynthia Reed Eddy
Cynthia Reed Eddy
United States Magistrate Judge

cc:    All counsel of record
via CM/ECF electronic filing